**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

CORAVIN, INC.
28 Crosby Drive, Suite 100
Bedford, Massachusetts 01730,

      Plaintiff,

  v.

HELLO GOOD DEAL, INC.
C/O REGISTERED AGENT
10 Manchester Road
Yarmouth Port, MA 02675,

      And,

LUCAS VELOSO SOARES,
10 Manchester Road
Yarmouth Port, MA 02675,

      And,

JOHN DOES 1-100, individually or as
corporate/business entities,

      Defendants.

    :
    :
    :
    :
    :
    :
    :
    :
    :
    :
    :

COMPLAINT FOR DAMAGES,
INJUNCTIVE AND OTHER RELIEF
FOR VIOLATIONS OF 15 U.S.C.
§ 1114; 15 U.S.C. § 1125(a); AND
RELATED CLAIMS; AND JURY
DEMAND

Plaintiff Coravin, Inc. ("Coravin") brings this action against Defendants Hello Good Deal, Inc., Lucas Veloso Soares, and John Does 1-100 (collectively, "Defendants") for trademark infringement in violation of the Lanham Act, 15 U.S.C. §§ 1114; false advertising and unfair competition in violation of 15 U.S.C. § 1125(a)(1); unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A; common law trademark infringement and unfair competition; and tortious interference with contract and business relations, and alleges as follows. These claims arise from Defendants' misappropriation of Coravin's trademarks in conjunction with Defendants' unlawful and unauthorized sale of materially different and non-genuine products bearing Coravin's trademarks that are not subject to, do not abide by, and interfere with Coravin's quality controls.

## PARTIES

1.      Coravin is a Delaware corporation with its principal place of business at 28 Crosby Drive, Suite 100, Bedford, Massachusetts 01730.

2.      Upon information and belief, Defendant Hello Good Deal, Inc. is a Massachusetts corporation with a registered address and principal place of business at 10 Manchester Road, Yarmouth Port, MA, 02675.  Hello Good Deal operates an online storefront on Amazon.com ("Amazon") currently called "Hello Good Deal INC" with Merchant ID A1TANA1JY0Y8AC ("Amazon Storefront").[1]

3.      According to the Massachusetts Secretary of State filings, Defendant Lucas Velaso Soares is the president, treasurer, secretary, director, and registered agent for service of process for Defendant Hello Good Deal, and resides at Hello Good Deal's registered address in Yarmouth Port, Massachusetts.  Soares operates the Amazon Storefront in conjunction with Hello Good Deal.

4.      The true names, involvement, and capacities, whether individual, corporate, associated or otherwise, of Defendants John Does 1-100 are unknown to Coravin.  Therefore, Coravin sues these Defendants by a fictitious name.  Coravin is informed and believes, and on that basis alleges, that the John Doe Defendants sued herein are equally responsible for the events and occurrences referred to herein or otherwise interested in the outcome of the dispute.  For example, they may have supplied Defendants with non-genuine products bearing Coravin trademarks or otherwise assisted in the operations and sales of the Amazon Storefront.  When the true names, involvement, and capacities of these parties are ascertained, Coravin will seek leave to amend this Complaint accordingly.

---

[1] While sellers can change the name of their storefronts, the Merchant ID does not change.

**JURISDICTION**

5.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338 for Coravin's claims that arise under federal law, and 28 U.S.C. § 1367 for Coravin's claims that arise under state law because they form part of the same case or controversy under Article III of the United States Constitution.

6.     This Court has personal jurisdiction over Defendant because upon information and belief, Defendants are located in Massachusetts.  In addition, they have expressly aimed tortious activities toward the Commonwealth of Massachusetts and established sufficient minimum contacts with Massachusetts by, among other things, advertising and selling infringing Coravin Products to consumers within Massachusetts through one or more highly interactive commercial websites with the knowledge that Coravin is located in Massachusetts and is harmed in Massachusetts as a result of Defendants' sales of infringing Coravin Products to Massachusetts residents.  Defendants have known that Coravin is located in Massachusetts, among other reasons, because they have received cease-and-desist letters from Coravin.  Coravin's claims arise out of Defendants' sales of infringing Coravin Products to Massachusetts residents.

7.     Defendants have created an interactive storefront on Amazon called Hello Good Deal INC.  Through this interactive storefront, Defendants actively advertise, market, sell, store, ship, and distribute infringing products bearing Coravin's trademarks in Massachusetts and to Massachusetts residents.  Defendants continue to engage in these actions despite being put on notice of their illegal conduct and the impendency of this action.

8.     Defendants' activities in Massachusetts have been significant and they have made substantial and regular sales of infringing products bearing Coravin's trademarks to Massachusetts residents.  Defendants have sold, and continue to regularly sell, additional infringing products bearing Coravin's trademarks into Massachusetts and to Massachusetts residents.

## VENUE

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district or, in the alternative, because a Defendant is subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS
### Coravin and Its Trademarks

10.     Established in 2011, Coravin is a global wine technology company.  Its products include wine accessories and award-winning preservation systems that enable the pouring of wine without removing the cork and protect the remaining wine from oxidation ("Coravin Products").

11.     Coravin's unique wine preservation system is a highly technical precision instrument, utilized by not only home connoisseurs, but also restaurants and wine bars, wineries, and wine stores, and has been hailed as changing the way the world drinks wine.

12.     Coravin's wine preservation system works, in part, by using Coravin's high pressure gas capsules.  These gas capsules contain Argon gas, which need to be handled with care. The use of non-genuine capsules, including large capacity gas sources, can result in gas leaks, which could cause serious injury or death.  Non-genuine capsules may also be degraded or contain less gas than genuine capsules, reducing their useful life and value to consumers.

13.     Coravin devotes a significant amount of time, energy, and resources toward protecting the value of the Coravin brand, products, name, and reputation.  Notably, Coravin sells Coravin Products exclusively through a network of authorized resellers ("Authorized Resellers"). By distributing Coravin Products exclusively through Authorized Resellers, Coravin ensures that users of its products receive the high-quality products that they expect from Coravin and that they receive the full suite of customer support services that accompany genuine Coravin Products.  In

the highly competitive wine products industry, quality and customer support are fundamental to a customer's decision to purchase a product.

14.     To promote and protect the Coravin brand, Coravin has registered numerous trademarks with the United States Patent and Trademark Office, including but not limited to: CORAVIN® (U.S. Reg. Nos. 4,568,810 and 4,577,185), CORAVIN PURE® (U.S. Reg. No. 6136861), CORAVIN SPARKING® (U.S. Reg. No. 7,007,019), CORAVIN MOMENTS® (U.S. Reg. No. 6,053,973), PIVOT ® (U.S. Reg. No. 6,322,642) (collectively, "Coravin Trademarks"). It has also applied for trademarks CORAVIN VINITAS (Serial No. 97566807) and ENOLOQ (Serial No. 97668387).

15.     The registrations for the Coravin Trademarks are valid, subsisting, and in full force and effect.  Pursuant to 15 U.S.C. § 1065, the Coravin Trademarks serve as conclusive evidence of Coravin's ownership of the marks and of Coravin's exclusive right to use and direct the use of the marks in commerce and in connection with the sale and distribution of Coravin Products identified in the registrations, as provided by 15 U.S.C. § 1115(b).

16.     Coravin actively uses and markets the Coravin Trademarks in interstate commerce.

17.     Consumers recognize the Coravin name for its affiliation with wine products and its innovation.

18.     The Coravin name, brand, and image is well-recognized by consumers throughout the United States for its wine products.

19.     Due to the superior quality and exclusive distribution of Coravin Products, and because Coravin is uniquely recognized as the source of these high-quality products, the Coravin Trademarks have considerable value.  Coravin is recognized as the source of products bearing the Coravin Trademarks.

**Online Marketplaces and the Challenges They Present to Coravin Product Quality**

20.     E-commerce retail sales have exploded over the past decade.  From 2009 through the end of 2022, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.8% to 14.7%.  *E-Commerce Retail Sales as a Percent of Total Sales*, Federal Reserve Bank of St. Louis (February 17, 2023), https://fred.stlouisfed.org/series/ECOMPCTSA.

21.     In 2022 consumers spent $1.03 trillion on e-commerce sales, a 7.7% increase from 2021.  *See* Paul Conley, *U.S. ecommerce in 2022 tops $1 trillion for first time*, Digital Commerce 360 (February 17, 2023),  https://www.digitalcommerce360.com/article/us-ecommerce-sales/. The massive growth in e-commerce is being driven largely by sales on online marketplaces.  For example, in 2021 United States consumers spent more than $378 billion in e-commerce sales on Amazon, which was an 18.8% increase from 2020 and 43.5% of total e-commerce sales in 2021.

22.     While online marketplaces have created a great deal of opportunity, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

23.     Unlike when purchasing products at a brick-and-mortar store, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them.  Instead, consumers must trust that the product they receive from an online order will be authentic and of the quality they expect and typically receive from the manufacturer.

24.     Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.  As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

25.     Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) brand owners who exercise quality controls over their products sold by authorized sellers.  It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels.  *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market,"* CNBC, Sept. 8, 2016,  https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.  It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces.  *See* Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

26.     The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on online marketplaces that diverters are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine.  *See* Spencer Soper, *Amazon Gets Real About Fakes*, Bloomberg, Nov. 28, 2016,  https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea markets of fakes*, THE WASHINGTON POST, Nov. 14, 2019, https://www.washingtonpost.com/technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-market-fakes/.

27.     The problem of sales of counterfeit and other poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance Committee issued a bipartisan report on the issue.  The Committee found that the rise of e-commerce has fundamentally changed how consumers shop for products and that, as e-commerce has grown, counterfeit goods and products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms.  The Committee concluded that these sales are a "significant threat" to rights holders' brands and to consumers, and that under current law it is up to rights holders to protect their intellectual property rights online.  *See* Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

28.     In January 2020, the Department of Homeland Security published a report noting that online marketplaces can facilitate the sale of counterfeit goods and that "American consumers shopping on e-commerce platforms and online third-party marketplaces now face a significant risk of purchasing counterfeit or pirated goods."  Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 24, 2020), available at https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf, at 7.  The report stated that consumers on online marketplaces cannot rely on traditional "red flag" indicators of counterfeits and "have been surprised to discover that upon completion of an online sales transaction, that the order will be fulfilled by an unknown third-party seller."  *Id*. at 14-15, 38.  To mitigate these problems, the report recommended "[s]ignificantly enhanced vetting of third-party sellers."  *Id.* at 35.

29.     In its 2018, 2019, 2020, 2021, and 2022 annual reports to its shareholders, Amazon acknowledged that third party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers. *See, e.g.,* Amazon.com, Inc., Annual Report (Form 10-K), at 8 (Feb. 2, 2023), *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/336d8745-ea82-40a5-9acc-1a89df23d0f3.pdf. Amazon conceded that these actions are "violating the proprietary rights of others" and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

30.     Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic. A brand owner's inability to exercise control over the quality of its products presents serious risks to the health and safety of consumers and their pets—particularly when, as here, a brand owner's products are injected into and ingested by pets.

31.     The structure, construction, and user interface of online marketplaces also pose threats to a brand owner's ability to maintain its goodwill, reputation, and brand integrity.

32.     When purchasing products on an online marketplace, customers are ordinarily not informed whether a seller of a product is authorized by the brand owner. Additionally, the interface design of many online marketplaces causes consumers to falsely believe that they are always purchasing from the brand owner or, at minimum, from an authorized seller that is selling under the brand owner's oversight and with the brand owner's approval. Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "Brand [name of brand]" immediately

under the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the brand owner.

33.     For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the brand owner's quality controls.

34.     When a consumer purchases on an online marketplace and receives a product that is damaged, defective, or of otherwise poor quality, the consumer is much more likely to associate the problem with the brand/manufacturer rather than the product seller.

35.     Online marketplaces also give disgruntled customers a powerful and convenient forum to air their grievances about problem products:  online product reviews.  Any consumer who is dissatisfied with a product received can post a review on the marketplace for all other consumers across the world to see.  These reviews, which often remain permanently attached to products, will often criticize the brand rather than the marketplace seller that sold the product.

36.     Online product reviews significantly impact a brand's reputation.  Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such reviews.  Aaron Smith & Monica Anderson, *Online reviews*, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

37.     Studies and surveys consistently show that consumers place extraordinary trust in online product reviews.  For instance, research has shown that 49 % of online consumers now trust online reviews as much as personal recommendations from friends and family.  Jamie Pitman, *Local          Consumer          Review          Survey          2022*,          BRIGHTLOCAL, https://www.brightlocal.com/research/local-consumer-review-survey/.    The  mere  presence  of

reviews on an online product page can also increase conversion by up to 270% when compared to product pages that do not display reviews.  Tom Collinger, *How Online Reviews Influence Sales*, NORTHWESTERN UNIVERSITY, https://spiegel.medill.northwestern.edu/how-online-reviews-influence-sales/.  Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces.  Megan Henney, FTC cracking down on fake Amazon reviews, FOX BUSINESS, Feb. 28, 2019, https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

38.     Consumers also pay special attention to negative online reviews of products because negative reviews are generally outnumbered by positive reviews and consumers believe negative reviews are particularly trustworthy due to their scarcity.  *See* Caroline Beaton, *Why You Can't Really Trust Negative Online Reviews*, THE NEW YORK TIMES, June 13, 2018 https://www.nytimes.com/2018/06/13/smarter-living/trust-negative-product-reviews.html. According to one study, 85% consumers will intentionally seek out negative reviews when shopping online.  Faith Hinz, *The Growing Power of Reviews*, POWERREVIEWS, 2018, https://www.powerreviews.com/wp-content/uploads/2018/03/The-Growing-Power-of-Reviews.pdf.  As a result, brands are especially harmed when consumers leave negative product reviews after purchasing from an unauthorized seller because the reviews will be widely viewed and deemed to be particularly accurate in describing a product's quality.

39.     Negative reviews also hurt a brand's placement in search results on Amazon and other search engines, as Amazon's search algorithm downgrades products it believes consumers are less likely to buy.  Thus, poor reviews can create a downward spiral where downgraded search

placement leads to reduced sales, which leads to search placement falling further.  For all of these reasons, negative online reviews can be the death knell for a manufacturer's online product listings.

### Coravin Has Been the Target of Multiple Negative Online Marketplace Reviews from Customers Who Purchased Products from Unauthorized Sellers

40.     Unauthorized sellers like Defendants frequently ship poor-quality products bearing the Coravin trademarks to consumers, who then blame Coravin and leave negative reviews on the product listings for Coravin Products.  Because reviews on a product listing cannot be traced to a particular seller, they injure consumer perceptions of Coravin's product rather than the seller, ultimately causing consumer confusion, and damaged goodwill and lost sales for Coravin.

41.     For example, customers complained of receiving empty cartridges or cartridges that leaked.



Rafael

★☆☆☆☆   **All cartridges came with a malfunction**
Reviewed in the United States on August 21, 2023
**Verified Purchase**
The batch that I bought all the cartridges came with a malfunction and kept leaking gas.

David W.

★☆☆☆☆   **Never got a chance to use them because the tanks were empty**
Reviewed in the United States on March 25, 2023
Color: Black   |   **Verified Purchase**
Followed instructions. Tank installed correctly went to use it and it let a couple drops out then nothing. Brand new out of box and I can't use it.
One person found this helpful

12

 Snuggleup_w_books

⭐☆☆☆☆ **Not really lasting long**

Reviewed in the United States on June 19, 2022

Verified Purchase

The gas starts to leak and doesn't last long...

 Amazon Customer

⭐⭐⭐☆☆ **Needle broke after two uses**

Reviewed in the United States on August 11, 2022

Color: Black  |  Verified Purchase

Arrived with an empty argon cartridge and appears to have a bent needle.

5 people found this helpful

42.    Other customers complained of receiving a product with subpar cartridges that did not last as long as they should.  Each cartridge is designed to pour up to 15 glasses of wine, so the customer may have been shipped damaged or degraded cartridges by the seller.

 Laurie J.

⭐⭐☆☆☆ **Bad cartridges**

Reviewed in the United States on July 8, 2023

Verified Purchase

Three of the cartridges seemed to be bad. I got half a bottle use of of them. This is not normal. Disappointing.

 J. Van

★★☆☆☆ **A quality control issue?**

Reviewed in the United States on August 22, 2022

Verified Purchase

I have been using my Coravin for several years now with not issues. I order 6 capsules at a time last me about 1 year. The most reset set though - about 3 months. After some investigation of my Coravin and capsules, I noticed the ends of some capsules were slightly damaged, like a slight scratch or dent. It's hard to see unless you hold it under the light. This could have caused a slow leak. I noticed other reviewers complaining about "less gas" in recent reviews. I wonder if there was a recent batch of defective capsules maybe??

5 people found this helpful

 Laney

★☆☆☆☆ **Capsules have very little gas in them**

Reviewed in the United States on February 11, 2022

Verified Purchase

At least half of the capsules in my order of 6 had very little gas in them. As a result I was only able to use each of those capsules once or twice. Very disappointed.

2 people found this helpful

 Doug S

★★☆☆☆ **6 capsules in and stopped working properly**

Reviewed in the United States on January 11, 2023

Color: Gray

Many reviews are correct, the capsules don't last long, but you can find them in bulk and they're worth the money if the gadget works. Unfortunately, mine quit working after about 6 capsules. I am sending back to Coravin and will ask for a replacement but don't hold out much hope. Best of luck if it works for you!

2 people found this helpful

 Ignacio

 ★☆☆☆☆ **Does not work**

Reviewed in the United States on June 4, 2022

Color: Black | **Verified Purchase**

Argon capsule only lasted for 2 glasses!! Not worth it

One person found this helpful

 ★★★☆☆ **Great but...**

February 11, 2019

Style Name: Coravin Limited Edition Bundle | Verified Purchase

I love this product but I am disappointed by the cartridges. One only gave me two glasses and pooped out. And they are so expensive to replace. One of the bottles leaked and it didn't work correctly. It's like it only works as advertised 50% of the time. 50/50..

43.     Previously, another Amazon user complained of receiving a product that was missing cartridges entirely.



44.     Other Amazon customers, as seen in the following screenshots, have also complained that Coravin Products they purchased on Amazon (likely from unauthorized third-party sellers like Defendants) were not as good as ones they purchased from Coravin directly:







Amazon Customer

★☆☆☆☆  **No gas**

Reviewed in the United States on May 22, 2019

**Verified Purchase**

My cartridges were empty. Thought it was a great deal but, will only purchase directly from Coravin for now on. The last two orders both failed and my wines were ruined

2 people found this helpful

| Helpful | ˅ 1 comment | Report abuse |



Amazon Customer

★☆☆☆☆  **Not worth it**

Reviewed in the United States on March 21, 2019

**Verified Purchase**

I love my Coravin and the two original canisters worked great and the bottles kept well.
However these were terrible. If I could give zero stars I would because the one was empty and the other one started to expel the wine but was only able to do one glass.....not
12-15 like Coravin system promises. Also, the one bottle that I was able to get wine out of spoiled....very unhappy and won't order again. Hopefully Coravin sees all these
unhappy customer reviews and gets the s*** together. The system would be worth the money if the replacement canisters actually did what they promised.

12 people found this helpful

| Helpful | ˅ 1 comment | Report abuse |



Elizabeth P.

★☆☆☆☆  **defective**

Reviewed in the United States on November 20, 2019

**Verified Purchase**

defective...last for loess than 1 glass! really???? What a lousy product as originals lasted for months!!! Do NOT buy!!!

| Helpful | ˅ 1 comment | Report abuse |

45.   Other customers have also complained of receiving defective products bearing Coravin's trademarks, and some of these customers left reviews warning others not to buy Coravin Products on Amazon.



Carley

★☆☆☆☆  **Do.not buy!!**

Reviewed in the United States on October 23, 2019

**Verified Purchase**

I have only used one of the pack of 2 and now that I'm reading other reviews my capsules were not all the way filled. I was only able to use a capsule one time and the ones that
came with my Corsavin system lasted me several times. Unfortunately I didn't use them in time and cannot return them for a refund. I feel completely jipped do not buy these
capsules from here.

| Helpful | ˅ 1 comment | Report abuse |





46.     Lastly, other customers complained about the safety issues their products presented, which resulted in explosions.



> **gabby wilson**
> ★☆☆☆☆ **Caution explosion hazard**
> Reviewed in the United States on September 19, 2022
> Color: Black    Verified Purchase
> As I was pouring the wine in a glass, the wine stopped coming and then the entire bottle exploded. Luckily no one was hurt but because of over pressure wine and glass shot all over my entire kitchen.
> 8 people found this helpful

47.     Upon information and belief, the foregoing complaints were made by consumers in response to products that were purchased from unauthorized sellers of products bearing the Coravin Trademarks, like Defendants.

**Coravin Has Implemented Strict Quality Control Procedures to Combat the Problems Presented by the Online Marketplaces and Protect the Value of the Coravin Trademarks**

48.     Recognizing the risks and reputational concerns associated with the illegal sale of Coravin Products by unauthorized sellers like Defendants who do not abide by Coravin's quality controls and peddle non-genuine, poor-quality products to unsuspecting consumers, Coravin has implemented a quality control program, which applies to both brick-and-mortar retail settings and online sellers, with the twin aims of protecting consumers and protecting the value and goodwill associated with the Coravin brand.

49.     The goal of Coravin's quality control program is to ensure that consumers who buy Coravin Products online receive products that feature all of the special characteristics that consumers have come to expect from products sold under the Coravin name—in particular, safety and quality.

50.     The program seeks to minimize the likelihood that poor-quality products will reach consumers.  By preventing consumers from receiving poor-quality products, the program both protects consumers from confusion and poor-quality products, and also protects the value and goodwill associated with the Coravin brand.

51.     Coravin abides by its quality control requirements and requires its Authorized Resellers to abide by its quality control requirements.

52.     Coravin's ability to exercise its quality controls is essential to the integrity, safety, and quality of Coravin Products, as well as the value of the Coravin Trademarks and other intellectual property.

### Authorized Resellers Are Required to Adhere to Coravin
### Quality Control and Customer Service Requirements

53.     Coravin maintains the quality controls over Coravin Products by selling them exclusively through Authorized Resellers.

54.     Coravin Authorized Resellers are required to sell products only in certain channels, and to abide by Coravin's agreements, policies, and other rules (collectively, the "Coravin Rules").

55.     To prevent third parties from acquiring and reselling Coravin Products, the Coravin Rules allow Authorized Resellers to sell products only to end users.  Authorized Resellers are prohibited from selling Coravin Products to anyone who intends to resell the products.

56.     Authorized Resellers are also prohibited from selling Coravin Products on any third-party marketplaces such as Amazon, eBay, Walmart Marketplace, or Craigslist, without prior written consent of Coravin.

57.     These restrictions allow Coravin to know who its Authorized Resellers are, which ones are selling online, and how to immediately contact them in the event of any product-quality issues.

58.     The Coravin Rules also require Authorized Resellers to adhere to several quality control requirements that specify the manner in which Coravin Products may be handled, marketed, sold, and administered to consumers.

59.     To ensure that customers receive the genuine and high quality products they expect from Coravin, the Coravin Rules require Authorized Resellers to inspect all products for damage, defects, evidence of tampering, and other non-conformance, and remove all such products from inventory.  Further, to assist Coravin in identifying any product quality issues, Authorized Resellers are required to report any defects to Coravin.

60.     The Coravin Rules also require that Authorized Resellers store Coravin Products in a cool, dry place, away from direct sunlight, extreme heat, and dampness, and in accordance with any additional storage guidelines specified by Coravin from time to time.  These storage requirements ensure that customers receive quality products that are not damaged.

61.     To avoid customer confusion and ensure that customers receive genuine Coravin Products, Authorized Resellers are also prohibited from altering, tampering with, or repackaging any products, or from removing, obliterating, or tampering with the batch codes or security codes on the products.

62.     Coravin also ensures that consumers receive safe products by requiring that Authorized Resellers communicate all safety information to consumers and cooperate with Coravin with respect to any product recall.

63.     The Coravin Rules also require that Authorized Resellers provide certain services to their customers.  Authorized Resellers must be knowledgeable about all Coravin Products they offer, ensuring that Authorized Resellers are able to provide their customers with knowledgeable, professional recommendations on the selection and safe use of Coravin Products.

64.     Authorized Resellers must also make themselves available to respond to customer questions and concerns both before and after the sale of Coravin Products, and must respond to customer inquiries promptly.

65.     Coravin's quality control requirements are legitimate, substantial, and non-pretextual, and have been implemented so that Coravin can control the quality of goods manufactured and sold under the Coravin Trademarks, which protects consumers and the value and goodwill associated with the Coravin Trademarks.

66.     Coravin's quality control requirements are also material, as they are designed to protect consumers and prevent them from receiving poor-quality products that could harm them.

67.     Consumers would find it material and relevant to their purchasing decision to know whether a Coravin product they were considering buying was being sold by an Authorized Reseller who is subject to Coravin's quality control requirements, or whether it is being sold by an unauthorized seller who is not subject to and does not abide by Coravin's quality controls and over whom Coravin is unable to exercise its quality controls.

**Genuine Coravin Products Come With a Limited Warranty; Defendants' Products Do Not**

68.     Coravin Products purchased from Coravin and Coravin's Authorized Resellers also come with Coravin's Limited Warranty (the "Limited Warranty").  The Limited Warranty provides for repair or replacement of all manufacturer defects for a specified time, depending on the product at issue, from the date that the unit is purchased.  For the Limited Warranty to apply, the Coravin Products must have been purchased from Coravin or an Authorized Reseller.  *See Coravin Limited Warranty Policy, available at* https://www.coravin.com/support/returns-and-warranty.  Such statements are incorporated herein.

69.     Because products sold by unauthorized sellers are not subject to Coravin's quality control requirements and Coravin cannot ensure the quality of the products sold by unauthorized sellers, the Limited Warranty is not available for Coravin Products sold by unauthorized sellers like Defendants or through unauthorized channels, unless prohibited by law.

70.    Due to the nature of Coravin's unique and highly technical products, consumers purchasing Coravin Products find it material and relevant to their purchasing decisions to know whether the products they are purchasing are covered by the Limited Warranty.  If a consumer knows a product does not come with the Limited Warranty, the consumer would be less likely to purchase the product.

**Coravin Has Taken Additional Steps to Protect the Quality of Products Sold Online**

71.    Given the many unscrupulous sellers like Defendants selling products on the online marketplaces today, Coravin has taken additional steps to prevent the unauthorized sales of its products online and to ensure that Coravin Products purchased on the online marketplaces are subject to and abide by Coravin's quality controls.

72.    Coravin allows Authorized Resellers to sell Coravin Products only on private websites and under storefront names that Coravin has specifically approved.  This requirement allows Coravin to have full visibility into, and oversight over, Authorized Resellers that are selling its products online.

73.    Knowing which of its Authorized Resellers are approved to sell online is critical to Coravin's ability to exercise its quality controls over its products sold online.  Having this information allows Coravin to monitor its Authorized Resellers that are selling online and to immediately address any quality issues or negative reviews that arise.  Coravin is unable to address quality issues that arise with unauthorized sellers like Defendants.

74.    Coravin also vets its Authorized Resellers before approving them to sell online or on the online marketplaces to ensure that they meet Coravin's criteria and will properly represent the Coravin brand.

75.    Before approving an Authorized Reseller to sell online or on the online marketplaces, Coravin verifies that the Authorized Reseller has:  (i) an appropriately registered

and recognized business that meets applicable criteria (*i.e.* credit, sales history, facility requirements); (ii) an acceptable online review history, without a significant presence of negative product or seller reviews; and (iii) an acceptable business operating record, which includes evaluating, among other things, any lawsuits, complaints, or actions related to the delivery of damaged products, misrepresented products, poor-quality products, or other similar issues.

### Defendants Are Not Authorized Resellers and Are Illegally
### Selling Products Bearing the Coravin Trademarks

76.     Due to the risks to customers and reputational concerns associated with the illegal sale of Coravin Products by unauthorized Internet sellers, Coravin monitors the sale of Coravin Products online.

77.     Through these efforts, Coravin discovered Coravin Products being illegally sold by Defendants on Amazon under the Storefront.

78.     Defendants are not Authorized Resellers of Coravin Products and do not comply with Coravin's Authorized Reseller requirements or the Coravin Rules.

79.     Coravin has not approved Defendants to sell products bearing the Coravin Trademarks online.

80.     Despite not being approved as an Authorized Reseller, Defendants have sold, and continue to sell, products bearing the Coravin Trademarks on the Storefront.

81.     Upon information and belief, Defendants, through Amazon, accept and fulfill orders from Massachusetts residents for Coravin Products and ship Coravin Products to persons located in Massachusetts.

82.     This is true because Defendants utilize the "Fulfilled by Amazon" ("FBA") service (red circle for emphasis):



83.     The FBA service requires Defendants to ship their products to Amazon's warehouses and, if and when sold, the products are shipped by Amazon to the buyer. Amazon does not contact sellers for approval of the purchase. Defendants retain ownership of the products they store at Amazon warehouses until they are purchased by consumers.

84.     By selling items FBA, Defendants agreed to have their products stored across the country, including in the 1.3 million square foot fulfilment center in Fall River, Massachusetts. *See* https://www.bostonglobe.com/2020/06/03/business/busy-stretch-dorchester-ave-could-become-home-an-amazon-warehouse/.

85.     By virtue of utilizing the Amazon FBA service, through their Storefront, Defendants accept and fulfill orders from Massachusetts residents for products bearing the Coravin Trademarks and allow infringing products bearing the Coravin Trademarks to be shipped to persons located in Massachusetts through the regular course of business. Indeed, by virtue of utilizing Amazon's FBA service, Defendants agree to sell and ship product to all fifty states.

**Defendants Do Not Abide by Coravin's Quality Controls
and Customer Service Requirements**

86.     Defendants do not abide by Coravin's quality control measures that are imposed upon genuine Coravin Products.

87.     Defendants also do not comply with Coravin's quality control requirements because they have not disclosed to Coravin where they acquire products that bear the Coravin Trademarks.  Defendants' failure to provide such information prevents Coravin from determining if any products Defendants are selling, or have sold, are subject to a recall or consumer safety information effort.

88.     Defendants do not comply with Coravin's quality control inspection requirements because they do not inspect the products they sell for damage, defects, evidence of tampering, and other non-conformance and remove all such products from inventory.  Instead, upon information and belief, they sell products bearing the Coravin Trademarks that are incorrect, damaged, degraded, defective, or that have been tampered with.

89.     Defendants do not comply with Coravin's quality control storage requirements and, upon information and belief, do not store their products in accordance with the storage guidelines specified by Coravin.

90.     Defendants do not comply with Coravin's quality control requirements related to the handling, packaging, and shipping of products because they sell products bearing the Coravin Trademarks that are incorrect, damaged, degraded, defective, or that have been tampered with.

91.     Defendants also do not comply with Coravin's customer service requirements because they are not qualified or trained to accurately describe, demonstrate, and sell the products in their inventory or to advise customers on how to use Coravin Products safely and properly.

92.     Defendants also do not comply with Coravin's customer service requirements because they do not, and are unable to, provide the advice to consumers that Coravin requires of its Authorized Resellers and do not provide the type of ongoing support and response to consumer inquiries that Coravin requires of its Authorized Resellers.

93.     Defendants' failure to abide by these quality controls interferes with Coravin's quality controls and prevents Coravin from exercising control over the quality of products Defendants sell bearing the Coravin Trademarks.  Coravin is unable to audit Defendants to ensure they are complying with Coravin's quality controls and/or close their account if they fail to comply with Coravin's quality control requirements.

94.     Defendants' failure to comply with these quality controls also interferes with Coravin's quality controls because it prevents Coravin from being able to obtain Defendants' assistance with any recall or consumer safety information efforts that may arise related to any products they are selling or have sold in the past.

95.     Although most customers on Amazon leave feedback on products and do not read or write seller reviews, it is possible to review sellers.

96.     Defendants' failure to follow quality controls is evident in the negative seller reviews Defendants' Amazon Storefront has received.

97.     Some of these negative reviews complain that Defendants sent the customer the wrong quantity of product or the product arrived with missing items.  Given that numerous consumers have left negative reviews of Coravin Products due to receiving incorrect quantities or missing items (*see supra* ¶¶ 41-42), these types of seller mistakes can harm the Coravin brand.



★☆☆☆☆   "The whole blender top was missing"

By Chris long on April 23, 2023.

★★★☆☆   "belt was missing"

By Barbara on March 20, 2023.

★★☆☆☆   "The box to it was damaged and I need it for the weekend so I can't send it back"

By Dustin on February 25, 2023.

★☆☆☆☆   "Item said it was a 4 pack or pints and we only received 2"

By Bryant on January 1, 2023.

★☆☆☆☆   "Item has been open prior to being shipped to me and missing items."

By Perry on December 31, 2022.

★☆☆☆☆   "One item was missing, One item was defective and the seller try to lie and change the web page after (I had screen shoot and Amazon customer to prove it)."

By Segev Ben Hayon on September 5, 2022.

★☆☆☆☆   "Item has been open prior to being shipped to me and missing items."

By Perry on December 31, 2022.

98.     Defendants have also received customer complaints reporting the product received was damaged or in insufficient packaging.

 "Item arrived in a very damaged & mangled box w/ Fragile marked all over it."

By Kelly VanLandingham on August 8, 2023.

 "Compare it to the real website. Fake!"

By wendy on March 1, 2023.

 "Item was shipped in a black bag (chose to ship in original packaging) but the box inside was destroyed. One pot has a scratch in the outside and one has a scratch inside. Go figure it said item was new. I hardly doubt it."
Read less

By LNF on February 16, 2023.

 "Item came damaged (with a broken seal and protein powder spilling out into the box) I contacted seller to replace and did not hear back from them. DO NOT PURCHASE FROM THIS SELLER!"
Read less

By K Middleton on January 14, 2023.

99.     In addition to customer reviews reporting product quality issues, Defendants have received reviews complaining of Defendants' customer service.  This is not a surprise, given the tone of some of the public responses by Defendants:

 "Complete ripoff. I admit I misread it as 6 total bottles, and thus thought I was getting a good deal. 3 arrived, which though is an accurate description, is almost twice the cost! I can pay 3 60L bottles at my local target for ~$90! I paid $150 for 3. These grifters should be kicked off Amazon."
Read less

By David Frazer on June 22, 2023.

"Hello Dear Customer. We are just doing our job. Please check the ad before making the purchase, this is clearly stated. Grifters, how stupid to treat people. You don't know us to define it like that. We are people working towards our goals, if this didn't work for you please keep your comments to yourself. This is horrible!"
Read less

By Hello Good Deal INC on July 19, 2023.

 "They did not use the standard exchange packaging. No return box or label. When I sent a message they just sent a label for me to print that I had to shrink. Not customer centric"
Read less

By Scotty 63 on July 31, 2023.

 "Deceptive advertising. I did not think I was getting just one box for that price. I will not be buying from HelloGoodDeal again."

By ATLgal on July 9, 2022.

100.    These negative reviews show that Defendants do not follow adequate quality controls or customer service requirements and ship incorrect or poor-quality products to consumers that could lead to consumers becoming confused, blaming the brand, leaving negative reviews of the product.

**Defendants Are Infringing on the Coravin Trademarks by Selling Products Bearing the Coravin Trademarks That Are Not Subject to, Do Not Abide by, and Interfere With Coravin's Quality Controls and Customer Service Requirements**

101.    For the reasons set forth above, the products Defendants sell bearing the Coravin Trademarks fail to adhere to the extensive and legitimate quality controls that Coravin exercises over products bearing the Coravin Trademarks to protect consumers and its brand goodwill.

102.    The products sold by Defendants are not subject to, do not abide by, and interfere with Coravin's quality controls and customer service requirements.

103.    Because the products Defendants sell are not subject to, do not abide by, and interfere with Coravin's quality controls and customer service requirements, the products Defendants sell are materially different from genuine Coravin Products.

104.    Because the products Defendants sell are not subject to, do not abide by, and interfere with Coravin's quality controls and customer service requirements, the products Defendants sell are not genuine Coravin Products.

105.    Defendants' unauthorized sale of products bearing the Coravin Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Coravin Products, when, in fact, they are not.

106.    Defendants' unauthorized sale of products bearing the Coravin Trademarks infringes on the Coravin Trademarks and diminishes their value.

107.    Despite these facts, Defendants have sold, and continue to sell, products bearing the Coravin Trademarks through their Amazon Storefront without Coravin's consent.

**Defendants Are Infringing on the Coravin Trademarks by Selling Products Bearing the Coravin Trademark That Do Not Come With the Limited Warranty**

108.    As set forth above, genuine Coravin Products purchased from Coravin and its Authorized Resellers that comply with Coravin's quality controls come with the Limited Warranty.

109.    Because Defendants are not Authorized Resellers of Coravin Products and do not comply with Coravin's quality controls, the products they sell bearing the Coravin Trademarks do not come with the Limited Warranty.

110.    Because the products Defendants sell do not come with the Limited Warranty, they are materially different from genuine Coravin Products.

111.    Defendants' unauthorized sale of products bearing the Coravin Trademarks is likely to, and does, create customer confusion because customers who purchase Coravin Products from Defendants believe they are purchasing genuine Coravin Products that come with the Limited Warranty when they do not.

112.    Defendants' unauthorized sale of products bearing the Coravin Trademarks infringes on the Coravin Trademarks and diminishes their value.

113.    Despite these facts, Defendants have sold, and continue to sell, products bearing the Coravin Trademarks through their Amazon Storefront without Coravin's consent.

**Defendants Are Engaging in False Advertising by Falsely Representing That the Products They Sell Come With the Limited Warranty and Are in Violation of Amazon's Policies**

114.    When sellers list items on Amazon, Amazon requires the seller to identify the condition of the product for sale as one of the following:  "New"; "Renewed"; "Used – Like New

Case 1:23-cv-12024-MPK    Document 1    Filed 08/31/23    Page 31 of 48

or Open Box"; "Used – Very Good"; "Used – Good"; or "Used – Acceptable." *See* https://sellercentral.amazon.com/gp/help/external/200339950.

115.    Pursuant to Amazon's policies, a "New" product listing must come with the "original manufacturer's warranty":

**New:**

Just like it sounds. A brand-new item. ==Original manufacturer's warranty, if any, still applies, with warranty details included in the listing comments==. Original packaging is present for most New items but certain items like shoes may be re-boxed.

https://sellercentral.amazon.com/gp/help/external/200339950?language=en_US&ref=efph_200339950_cont_521.

116.    While the products Defendants are selling do not come with the Limited Warranty – as would be required to list the items as "new" – Defendants are nonetheless falsely advertising the products they sell as "New."

117.    Thus, by representing to consumers that the products they sell are "New" and come with the Limited Warranty, Defendants are falsely advertising the products they are selling.

118.    Defendants' decision to falsely advertise the products as "New" is not inadvertent, as evidenced by its other deceptive sales strategies.

119.    For example, upon information and belief, Defendants sell used or returned products as "New." Indeed, Defendants' "standard restocking fee" all but admits that Defendants do, indeed, restock and resell returned goods.

120.    Thus, by representing to consumers that the products they sell are "New" when the products have been opened or returned, Defendants are falsely advertising the products they are selling.

121.    Defendants' decision to falsely advertise the products as "New" is not inadvertent.

**Coravin Has Repeatedly Attempted to Stop Defendants' Illegal Sale of Infringing Products,
But Defendants Continue to Willfully Infringe on the Coravin Trademarks**

122.    Coravin polices the sale of its products online.  In the course of monitoring online listings of Coravin Products, Coravin discovered products bearing the Coravin Trademarks being illegally sold by Defendants on Amazon under the storefront name "Hello Good Deal INC".

123.    Coravin estimates that the Amazon Storefront has sold over 1,317 non-genuine products bearing the Coravin trademarks since January 2022.

124.    Because Defendants did not until recently disclose their business or contact information on their Amazon Storefront, Coravin had to spend significant time and money investigating the storefront to attempt to identify the real identity of the business and people operating it.[2]

125.    After conducting this investigation, Coravin identified Defendants as the owners and operators of the Amazon Storefront.

126.    Coravin sent Defendants a cease-and-desist letter on or about January 25, 2022, demanding that they stop selling products bearing the Coravin trademarks.

127.    This letter further notified Defendants that they were injuring Coravin in Massachusetts through their illegal actions and that they would be subject to personal jurisdiction in Massachusetts if they continued to engage in their conduct.

128.    This letter also notified Defendants that Coravin had contracts with its Authorized Resellers that prohibited sales to resellers and that Defendants would be tortiously interfering with

---

[2] On September 1, 2020, Amazon changed its policy regarding anonymous sales in an effort to curb sales of dangerous and counterfeit items.  *See* Jay Greene, *Amazon will disclose merchant names to discourage rogue sales*, WASH. POST. (July 8, 2020) https://www.washingtonpost.com/technology/2020/07/08/amazon-will-disclose-merchant-names-discourage-rogue-sales/.  However, many times, sellers will use fake or falsified information on their storefronts.

those contracts if they continued to purchase products bearing Coravin's Trademarks from Authorized Resellers for resale.

129.    Defendants did not respond to this letter and continued to sell products bearing the Coravin Trademarks on the Amazon Storefront.

130.    Hearing nothing from Defendants, Coravin sent a follow-up letter on or about March 23, 2022; May 11, 2022, and May 2, 2023.

131.    Defendants ignored all of these letters and continued to sell products bearing Coravin's trademarks.

132.    As a result, Defendants have misled, and continue to mislead, consumers into believing they are purchasing genuine Coravin Products when they are not.

<b>Defendants Are Tortiously Interfering With Coravin's Agreements<br>With Its Authorized Resellers</b>

133.    Upon information and belief, Defendants have purchased Coravin Products from Coravin's Authorized Resellers for purposes of reselling them on the Internet.

134.    The Coravin Rules prohibit Coravin's Authorized Resellers from selling Coravin Products to third parties who intend to resell the products.

135.    Defendants were informed of this prohibition by, at the latest, January 2022. Indeed, the cease-and-desist letter Coravin sent Defendants on or about that date informed Defendants that Coravin restricts the manner in which Authorized Resellers may sell Coravin Products, and that Authorized Resellers may sell Coravin Products only to end-user customers through authorized channels and are specifically prohibited from selling products to resellers or any person or entity they know, or have reason to know, intends to resell the products.

136.    Defendants were also informed that by purchasing Coravin Products from an Authorized Reseller for purposes of resale, they were causing a breach of the agreement between

Coravin and its Authorized Reseller and interfering with Coravin's agreements and business relationships.

137.    Defendants were also advised that if they continued to acquire Coravin Products from Coravin's Authorized Resellers for purposes of resale, they would be liable for tortiously interfering with Coravin's contracts and business relationships.

138.    Despite being provided this information, Defendants have continued to acquire Coravin Products from Coravin's Authorized Resellers.

139.    Upon information and belief, Defendants willfully and knowingly induced unknown Authorized Resellers to breach their agreements with Coravin so that they could acquire Coravin Products and resell them.

**Coravin Has Suffered Significant Harm as a Result of Defendants' Conduct**

140.    As set forth above, the unauthorized sale of products bearing the Coravin Trademarks through unauthorized sellers, such as Defendants, has caused significant harm to the Coravin brand.

141.    When a consumer receives a non-genuine, poor-quality, defective, or tampered-with product from Defendants, the consumer associates that negative experience with Coravin. Defendants' ongoing sale of unauthorized products bearing the Coravin Trademarks harms the Coravin brand.

142.    Coravin has suffered, and will continue to suffer, significant monetary harm as a result of Defendants' actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

143.    Coravin has suffered, and will continue to suffer, irreparable harm as a result of Defendants' actions, including, but not limited to, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights, and brand integrity.

144.    Coravin is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell Coravin Products, causing continued irreparable harm to Coravin's reputation, goodwill, relationships, intellectual property, and brand integrity.

145.    Defendants' conduct was, and is, knowing, intentional, willful, malicious, wanton, and contrary to law.

146.    Defendants' willful violations of the Coravin Trademarks and continued pattern of misconduct demonstrate intent to harm Coravin.

<b>Soares's Individual Liability</b>

147.    Coravin asserts its claims against Soares in both his individual capacity, as well as his capacity as a corporate officer of Hello Good Deal.

148.    Upon information and belief, Soares directs, controls, ratifies, participates, or is the moving force behind the sales of infringing products bearing Coravin's trademarks by Hello Good Deal.  Accordingly, Soares is personally liable for the infringing activities of Hello Good Deal without regard to piercing the corporate veil.

149.    Alternatively, upon information and belief, Hello Good Deal follows so few corporate formalities and is so dominated by Soares that Hello Good Deal is merely an alter ego of Soares.  This is reflected, in part, by the fact that the Hello Good Deal registered business address appears to be Soares's home address, and Soares is the president, treasurer, director, and registered agent for service of process for Hello Good Deal.  Accordingly, Coravin is entitled to pierce the corporate veil of Hello Good Deal and hold Soares personally liable for the infringing activities of Hello Good Deal.

# FIRST CAUSE OF ACTION
## Trademark Infringement
## 15 U.S.C. § 1114

150.     Coravin hereby incorporates the allegations contained in the foregoing Paragraphs 1-149 as if fully set forth herein.

151.     Defendants willfully and knowingly used, and continue to use, the Coravin Trademarks in commerce for purposes of selling non-genuine products bearing the Coravin Trademarks on the Internet without Coravin's consent.

152.     The products Defendants sell bearing the Coravin Trademarks are not authorized for sale by Coravin.

153.     The products Defendants sell bearing the Coravin Trademarks are materially different from genuine Coravin Products because they are not subject to, do not abide by, and interfere with the legitimate and substantial quality controls that Coravin has established.

154.     The products Defendants sell bearing the Coravin Trademarks are materially different from genuine Coravin Products because they do not come with the Coravin Limited Warranty, which accompanies genuine Coravin Products.

155.     Defendants' unauthorized sale of materially different products bearing the Coravin Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Coravin Products when they are not.

156.     Defendants' unauthorized sale of materially different products bearing the Coravin Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Coravin, when they are not.

157.    Defendants' unauthorized use of the Coravin Trademarks has infringed upon and materially damaged the value of the Coravin Trademarks, and caused significant damage to Coravin's business relationships.

158.    As a proximate result of Defendants' actions, Coravin has suffered, and will continue to suffer, immediate and irreparable harm.  Coravin has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

159.    Coravin is entitled to recover its damages caused by Defendants' infringement of the Coravin Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

160.    Coravin is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Coravin will suffer irreparable harm.

161.    Coravin is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Coravin Trademarks.

### SECOND CAUSE OF ACTION
**False Advertising and Unfair Competition
15 U.S.C. § 1125(a)(1)**

162.    Coravin hereby incorporates the allegations contained in the foregoing Paragraphs 1-149 as if fully set forth herein.

163.    As set forth above, in their listings on the Internet, including, but not limited to, Amazon.com, Defendants willfully and knowingly used, and continue to use, the Coravin Trademarks in interstate commerce for purposes of advertising, promoting, and selling Coravin Products without Coravin's consent.

164.    Defendants' advertisements and promotions of their products unlawfully using the Coravin Trademarks have been disseminated to the relevant purchasing public.

165.    As discussed above, Amazon requires sellers to identify the condition of products they sell.  Classifying a product as "New" on Amazon means that the product comes with the applicable warranties.

166.    Defendants falsely advertise that the products they sell bearing the Coravin Trademarks are "New" and come with the Limited Warranty.

167.    This representation is false because the products Defendants sell bearing the Coravin Trademarks do not come with the Limited Warranty.

168.    Defendants falsely advertise that the products they sell bearing the Coravin Trademarks are "New" when they are opened or returned products.

169.    This representation is false because the products Defendants sell bearing the Coravin Trademarks have been opened and returned.

170.    Therefore, Defendants' use of the Coravin Trademarks in connection with the unauthorized advertising, promotion, and sale of products misrepresents the nature, characteristics, qualities, and origin of the products.

171.    Furthermore, Defendants' use of the Coravin Trademarks is likely to cause confusion, cause mistake, or deceive as to Coravin's affiliation, connection, or association with Defendants' products.

172.    As a proximate result of Defendants' actions, Coravin has suffered, and will continue to suffer, damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

173.    Coravin is entitled to recover their damages caused by Defendants' infringement of the Coravin Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

174.    Coravin is entitled to injunctive relief under 15 U.S.C. § 1116 because they have no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Coravin will suffer irreparable harm.

175.    Coravin is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Coravin Trademarks.

## THIRD CAUSE OF ACTION
### Unfair and Deceptive Trade Practices
### Mass. Gen. Laws ch. 93A, §§ 1-11

176.    Coravin hereby incorporates the allegations contained in the foregoing Paragraphs 1-149 as if fully set forth herein.

177.    Coravin Products are sold and purchased through its Authorized Resellers throughout the United States, including Massachusetts.

178.    Defendants willfully and knowingly advertise, promote, and sell Coravin Products in interstate commerce on the Internet and in Massachusetts without the consent of Coravin.

179.    The products Defendants advertise, promote, and sell are not authorized for sale by Coravin.

180.    The products sold by Defendants are not, in fact, genuine Coravin Products.  The products sold by Defendants are materially different because, among other reasons, they are ineligible for the Limited Warranty and are not subject to, and do not abide by, Coravin's quality control program.

181.    The Limited Warranty is material, as consumers purchasing Coravin Products would find it relevant to their purchasing decision to know whether the product they are purchasing is covered by the Limited Warranty.

182.    Coravin has established and implemented legitimate and substantial quality control procedures that genuine Coravin Products must comply with.

183.    Coravin abides by these quality control procedures and requires all of its Authorized Resellers to abide by these quality controls.

184.    Coravin's quality controls are material, as they protect consumers and prevent them from receiving poor-quality products that could harm them.

185.    The products Defendants advertise, promote, and sell are not subject to, do not abide by, and interfere with Coravin's quality controls and customer service requirements.

186.    Because the products Defendants advertise, promote, and sell are not subject to, do not abide by, and interfere with Coravin's quality controls and customer service requirements, the products Defendants sell are materially different from genuine Coravin Products.

187.    Because the products Defendants advertise, promote, and sell are not subject to, do not abide by, and interfere with Coravin's quality controls and customer service requirements, the products Defendants sell are not genuine Coravin Products.

188.    Defendants' unauthorized advertising, promotion, and sale of products bearing the Coravin Trademarks misrepresents the nature, characteristics, qualities, and origin of Defendants' products because it suggests that the products Defendants offer for sale come with the Limited Warranty and customer service benefits that accompany genuine Coravin Products when they do not.

Case 1:23-cv-12024-MPK   Document 1   Filed 08/31/23   Page 41 of 48

189.   Defendants' unauthorized advertising, promotion, and sale of products bearing the Coravin Trademarks is material and likely to influence customers to purchase the products they sell, as consumers are likely to believe that the products Defendants advertise are genuine Coravin Products that are subject to Coravin's quality controls and come with the Limited Warranty and other benefits associated with authentic Coravin Products, when they are not.

190.   Defendants' unauthorized advertising, promotion, and sale of products bearing the Coravin Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Coravin when, in fact, they are not.

191.   Defendants' unauthorized sale of products bearing the Coravin Trademarks is likely to cause confusion, mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Coravin Products when, in fact, they are not.

192.   Defendants' unauthorized sale of products bearing the Coravin Trademarks is likely to cause confusion, mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Coravin when, in fact, they are not.

193.   Defendants' unauthorized use of the Coravin Trademarks in connection with the unauthorized advertising, promotion, and sale of Coravin Products constitutes unfair and deceptive trade practices under Mass. Gen. Laws ch. 93A, §§ 1-11.

194.   Defendants' unlawful actions and unauthorized use of the Coravin Trademarks has materially damaged the value of the Coravin Trademarks, caused significant damage to Coravin's business relations, and infringed on the Coravin Trademarks.

195.    As a proximate result of Defendants' actions, Coravin has suffered, and will continue to suffer, immediate and irreparable harm, as well as great damage, including to its business, goodwill, reputation, and profits in an amount to be proven at trial.

196.    Pursuant to Mass. Gen. Laws ch. 93A, §§ 1-11, Coravin is entitled to injunctive relief enjoining Defendants' conduct.

197.    Pursuant to Mass. Gen. Laws ch. 93A, §§ 1-11, Coravin is entitled to an award of double or treble damages, costs, and attorneys' fees.

198.    Coravin is also entitled to punitive damages because Defendants acted maliciously toward Coravin or in an intentional disregard of the rights of Coravin.

## FOURTH CAUSE OF ACTION
### Common Law Unfair Competition and Trademark Infringement

199.    Coravin hereby incorporates the allegations contained in the foregoing paragraphs 1-149 as if fully set forth herein.

200.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the Coravin Trademarks interferes with Coravin's quality controls and its ability to exercise quality control over products bearing the Coravin Trademarks.

201.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the Coravin Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Coravin Trademarks suggests that the products Defendants offer for sale are subject to, and abide by, Coravin's quality controls when, in fact, they are not.

202.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the Coravin Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Coravin Trademarks suggests that the products Defendants offer for sale are genuine Coravin Products with the Limited Warranty when, in fact, they are not.

203.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the Coravin Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Coravin Trademarks suggests that the products Defendants offer for sale are sponsored by, authorized by, or otherwise connected with Coravin when, in fact, they are not.

204.    Defendants' unlawful actions constitute active misrepresentation as to the source of the products they sell.  These false representations tend to confuse customers and induce them to believe that Defendants' products are genuine Coravin Products when, in fact, they are not.

205.    Defendants' unauthorized sale of products bearing the Coravin Trademarks and unauthorized use of the Coravin Trademarks in advertising infringes the Coravin Trademarks and constitutes unfair competition and trademark infringement at common law.

206.    Defendants' unauthorized use of the Coravin Trademarks has materially damaged the value of the Coravin Trademarks, caused significant damage to Coravin's business relations, and infringed the Coravin Trademarks.

207.    As a result, Coravin has suffered, and continues to suffer, immediate and irreparable harm.  Coravin has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

208.    Coravin is also entitled to punitive damages because Defendants acted with actual malice accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

### FIFTH CAUSE OF ACTION
### Tortious Interference With Contractual Relations

209.    Coravin hereby incorporates the allegations contained in the foregoing Paragraphs 1-149 as if fully set forth herein.

210.    Coravin has contracts and business relationships with its Authorized Resellers, who sell Coravin Products.  These contracts prohibit Coravin's Authorized Resellers from selling to unauthorized resellers such as Defendants for purposes of resale.

211.    Defendants are not Authorized Resellers of Coravin Products.

212.    Defendants have sold—and continue to sell—a high volume of products bearing the Coravin Trademarks through their Amazon storefront.

213.    Coravin has not itself sold any Coravin Products to Defendants.

214.    Based on these facts, it is plausible and a reasonable inference that Defendants acquired the products they are reselling from one or more of Coravin's Authorized Resellers.

215.    Defendants knew since (at the latest) receiving Coravin's January 2022 cease-and-desist letter, that Coravin had agreements with these Authorized Resellers that prohibited unauthorized online sales and sales to resellers, and that Defendants would be tortiously interfering with those agreements if they continued to acquire products from Authorized Resellers for resale online.

216.    Defendants, without legal right, privilege, or justification, intentionally interfered with the contracts and business relationships between Coravin and its Authorized Resellers by purchasing products from Authorized Resellers for the purpose of reselling products on the Internet in violation of the Authorized Resellers' contracts with Coravin.

217.    Upon information and belief, Defendants interfered with Coravin's contracts with its Authorized Resellers through wrongful means, namely concealing and failing to disclose their intention to resell the products online even after being informed that this intention would mean that Authorized Resellers would be breaching their agreements with Coravin by selling to Defendants.

218.    Because Defendants have refused to disclose how they have obtained the products bearing the Coravin Trademarks they have resold, Coravin must take discovery in this action to learn the specific identities of the Authorized Resellers that sold products to Defendants. Defendants, however, know the sources of the Coravin Products they have obtained and the basis for Coravin's claim of tortious interference.  Coravin's agreements with its Authorized Resellers are a specific class of contract that Defendants caused Authorized Resellers to breach when they purchased products from Authorized Resellers for resale.

219.    Defendants' actions have caused injury to Coravin for which Coravin is entitled to compensatory damages in an amount to be proven at trial.

220.    The injury to Coravin is immediate and irreparable, as Coravin's reputation and relationships have been damaged among both its consumers and Authorized Resellers.

221.    Coravin is also entitled to punitive damages because Defendants acted with actual malice and accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

## **PRAYER FOR RELIEF**

WHEREFORE, Coravin prays for relief and judgment as follows:

A.    Judgment in favor of Coravin and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, liquidated damages, restitution, including disgorgement of profits, punitive damages, and pre-judgment and post-judgment interest, as permitted by law;

B.    That a permanent injunction be issued enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and

all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

i)    Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all products bearing the Coravin Trademarks;

ii)   Prohibiting the Enjoined Parties from using any of the Coravin Trademarks in any manner, including advertising on the Internet;

iii)  Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all products bearing any of the Coravin Trademarks;

iv)   Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Coravin Trademarks including invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

v)    Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of Coravin's products, or any of the Coravin Trademarks;

vi)   Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo, and Bing) to remove from the Internet any of the Coravin

Trademarks which associate Coravin's products or the Coravin Trademarks with the Enjoined Parties or the Enjoined Parties' websites;

vii)    Requiring the Enjoined Parties to take all action to remove unauthorized Coravin Trademarks from websites they operate on the Internet, including from the websites www.amazon.com; and

viii)   Requiring the Enjoined Parties to destroy or return to Coravin all products bearing the Coravin Trademarks in their possession, custody, or control.

C.    An award of attorneys' fees, costs, and expenses.

D.    Such other and further relief as the Court deems just, equitable and proper.

Date: August 31, 2023                          /s/ Marie E. Chafe
                                               Marie E. Chafe    BBO#:  556632
                                               mchafe@connkavanaugh.com
                                               Conn Kavanaugh Rosenthal Peisch & Ford
                                               1 Federal Street, 15th Floor
                                               Boston, MA  02110
                                               (617) 482-8200
                                               (617) 482-6444 facsimile

                                               *Attorneys for Plaintiff Coravin, Inc.*

Of Counsel:

Martha Brewer Motley (Ohio Bar 0083788)
(*pro hac vice* applications forthcoming)
Vorys, Sater, Seymour and Pease LLP
52 E. Gay Street
P.O. Box 1008
Columbus, OH  43216-1008
Phone:  (614) 464-6400
Fax:  (614) 719-5080
Email:  mbmotley@vorys.com

**<u>JURY DEMAND</u>**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Coravin demands a trial by jury on all issues so triable.


Date: August 31, 2023                                   /s/ Marie E. Chafe
                                                        Marie E. Chafe     BBO#:  556632
                                                        mchafe@connkavanaugh.com
                                                        Conn Kavanaugh Rosenthal Peisch & Ford
                                                        1 Federal Street, 15th Floor
                                                        Boston, MA  02110
                                                        (617) 482-8200
                                                        (617) 482-6444 facsimile

                                                        *Attorneys for Plaintiff Coravin, Inc.*

Of Counsel:
Martha Brewer Motley (Ohio Bar 0083788)
(*pro hac vice* applications forthcoming)
Vorys, Sater, Seymour and Pease LLP
52 E. Gay Street
P.O. Box 1008
Columbus, OH  43216-1008
Phone:  (614) 464-6400
Fax:  (614) 719-5080
Email:  mbmotley@vorys.com